**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| AIYANNA JOHNSON individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>LAVOI CORPORATION d/b/a EPI BREADS,<br><br>*Defendant*. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

**ORIGINAL COMPLAINT—CLASS ACTION**

Plaintiff Aiyanna Johnson ("Plaintiff"), individually and on behalf of all others similarly situated, sues Lavoi Corporation, d/b/a Epi Breads ("Epi Breads" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals'

personally identifiable information ("PII" or "Private Information"), including, name and Social Security number (the "Private Information"), from criminal hackers. The data security incident (the "Data Breach") at issue occurred on or around August 22, 2024.

2. The Private Information compromised in the Data Breach included certain personal information of Defendant's customers and/or employees, including Plaintiff.

3. Defendant has disclosed to the Attorney General of Maine that the personal information 10,853 persons was affected.[1] Defendant has also given notice of the data security incident to the Attorney General of Vermont and Georgia.

4. The Data Breach resulted from Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted for employment or a business relationship or both.

5. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely

[1] Office of the Maine Attorney General, Data Security Breach Reports, *available at* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e4639d2d-5236-42ce-b346-fb892d7dfcf4.html (*last accessed* November 21, 2025).

and adequate notice to Plaintiff and other Class Members that their information was subjected to unauthorized access by an unknown third party and precisely what specific type of information was accessed.

6. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

7. Defendant, through its employees, disregarded the rights of Plaintiff and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendant also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

8. In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant's employees

(presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

9. Not only did cybercriminals gain unauthorized access to the Private Information of Plaintiff and the Class Members, but they stole that information and published it on the dark web, making it available for download.[2] As a result, the stolen Private Information can be used to commit fraud or identity theft against Plaintiff and the Class.

10. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

11. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

---

[2] https://www.hookphish.com/blog/ransomware-play-group-hits-epi-breads/ (last viewed November 21, 2025).

12. There has been no assurance offered by Defendant that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices in a manner that would be sufficient to avoid a similar breach of its network in the future.

13. Because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and ongoing risk of fraud and identity theft, Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

14. Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

16. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

17. Accordingly, Plaintiff sues Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of implied contract, and (iv) declaratory judgment.

## II. PARTIES

18. Plaintiff Aiyanna Johnson is and at all times mentioned herein was an individual citizen of Michigan, residing in the city of Muskegon.

19. Defendant Lavoi Corporation d/b/a/ Epi Breads is a domestic for-profit corporation with its principal place of business at 2650 Button Gwinnett Drive, Suite E, Atlanta, Georgia 30340.

20. Epi Bread's registered agent is Bret Hill, located at 2650 Button Gwinnett Drive, Suite E, Atlanta, Georgia 30340.

## III. JURISDICTION AND VENUE

21. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

22. Defendant is a citizen of Georgia because it has its principal place of business within this state.

23. This Court has general personal jurisdiction over Defendant because Defendant has a permanent physical location and operates in Atlanta, Georgia.

24. Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant conducts business in this District and because a substantial part of the acts or omissions giving rise to this action occurred within this District.

## IV. FACTUAL ALLEGATIONS

***Defendant's Business***

25. Defendant is a producer and distributor of customized bread operating in Atlanta, Georgia and works with a variety of customers including national food chains, small independents and food service companies.

26. In the ordinary course of working with Epi Breads, each employee must provide (and Plaintiff did provide) Defendant with sensitive, personal, and private information, such as her or her:

- name;
- address;
- telephone number;
- Social Security number;
- driver's license number;
- driver's license state;
- financial account numbers;
- other private data.

27. Due to the highly sensitive and personal nature of the information Defendant acquires and stores, Defendant, upon information and belief, promises to, among other things: keep the Private Information entrusted to it private; comply

with industry standards related to data security and the maintenance of its customers' and employees' Private Information; inform its employees of its legal duties relating to data security and comply with all federal and state laws protecting the Private Information entrusted to it; only use and release the Private Information for reasons that relate to the services it provides; and provide adequate notice to customers and employees if their Private Information is disclosed without authorization.

28. The employee and customer information held by Defendant in its computer system and network included the Private Information of Plaintiff and Class Members.

***The Data Breach***

29. A data breach occurs when cyber criminals access and steal Private Information that has not been adequately secured by a business entity like Defendant.

30. According to Defendant's notice letter (Exhibit A),

> **What Happened?** On August 22, 2024, EPI Breads learned of unusual activity involving certain systems in our network. …
>
> During our investigation, we learned that certain data stored on our systems may have been accessed or acquired without authorization in connection with the incident. In response, we undertook a review of all potentially affected data, which concluded on September 17, 2024, and revealed that some of your information may have been involved.
>
> **What Information Was Involved?** The potentially affected information includes your name and Social Security Number.

31. Plaintiff received notice of the Data Breach around October 30, 2024, informing her that her sensitive information was part of Defendant's Data Breach. A copy of the notice provided to Plaintiff is attached hereto as **Exhibit A**.

32. The notice of Data Breach omitted critical details of the Data Breach.

33. Concerningly, the cybercriminals that obtained Plaintiff's and Class Members' Private Information are the notorious cybercriminal group "Play Ransomware Group."[3]

34. Information about the data breach scraped directly from the "Play News" Dark Web Tor Blog page reflects that the Dark Web post had been viewed 351 times at the time of the scraping and that the Play Ransomware Group had established September 2, 2024, as the date it would publish the data contained in the stolen files.[4]

35. The Play Ransomware Group is linked to several high-profile data breaches and has successfully infiltrated over 300 organizations around the world.[5]

36. Play operates by "instal[ling] ransomware on a company's systems, encrypting their data and demanding a ransom payment or exfiltrating business data

[3] RedPacket Security, *Play Ransomware Victim: Epi Breads* (August 29, 2024), *available at* https://www.redpacketsecurity.com/play-ransomware-victim-epi-breads/ (last visited November 18, 2025).
[4] *Id.*
[5] Check Point, *Play Ransomware Group – Detection and Protection*, *available at* https://www.checkpoint.com/cyber-hub/threat-prevention/ransomware/play-ransomware-group-detection-and-protection/ (last visited November 18, 2025).

and selling it on the Dark Web forum."[6] Play publishes details of the attacks on its online Tor blog, including summaries of the data captured in the attack.[7]

37. Defendant claims to have "engaged a team of leading external cybersecurity experts" to investigate the data breach and assist with a response, indicating that Defendant knew who was responsible for the attack and what data was exfiltrated and ransomed in the Data Breach, yet Defendant failed to include this information in its notice to Plaintiff and the Class Members.

38. To date, Defendant has failed to confirm payment of the ransom to Play Ransomware Group by the September 2, 2024, publication date. As a result, the Private Information of Plaintiff and the Class Members has been published to the Dark Web, consistent with the Play Ransomware Group's standard practice.

39. The Dark Web is the "underbelly of the internet and home to stolen information, illegal goods and a myriad of criminal forums and shady activity."[8] Data that is published to the Dark Web is accessible to criminals who certainly intend to use the data to commit a variety of crimes including identity theft and fraud.[9] Once stolen PII is posted on the dark web, it will most likely be distributed

[6] *Id.*
[7] *Id.*
[8] https://www.crowdstrike.com/en-us/cybersecurity-101/threat-intelligence/dark-web/ (last viewed November 21, 2025).
[9] *Id.*

to multiple different groups and individuals, each of which can use that information for fraud and identity theft.[10]

40. As a result of Defendant's Data Breach, Plaintiff's and Class Members' stolen Private Information was published on the Dark Web, made available for download, and downloaded by unauthorized parties. Now, Plaintiff and the Class are at present, imminent and continuing threat of suffering fraud and identity theft.

41. The moment that Plaintiff's and Class Members' Private Information was accessed and obtained by a third party without their consent, Plaintiff and Class Members suffered actual injury.

42. The moment that Plaintiff's and Class Members' Private information was accessed, Plaintiff and Class Members suffered injury from a loss of privacy.

43. Defendant had obligations created by contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

44. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that

[10] *The Dark Web and Cybercrime, U.S. Dep't of Health and Human Servs. (July 23,2020), https://www.hhs.gov/sites/default/files/dark-web-and-cybercrime.pdf*

Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

45. Defendant was or should have been aware of the significant risk that cybercriminals would attempt to steal Plaintiff's and Class Members' Private Information.

46. As reported by Identity Theft Resource Center, there were 3,205 compromises of private data in 2023, a 72 percent increase over the previous all-time high reported in 2021.[11]

47. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Data Breaches Are Preventable***

48. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

---

[11] Identity Theft Resource Center, *2023 Annual Data Breach Report* (January, 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited November 7, 2024).

49. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its equipment and computer files containing Private Information.

50. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[12]

51. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans

[12] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[13]

52. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

[13] *Id.* at 3-4.

**Secure Internet-Facing Assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong,

  randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for

Office[Visual Basic for Applications].[14]

53. Given that Defendant was storing the Private Information of its current and former customers and employees, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

54. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves accessing and acquiring the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

55. Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems andthe theft of Plaintiff's and Class Members' confidential Private Information.

***Value of Private Information***

56. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person

[14] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

without authority."[15] The FTC describes personally "identifying information" ("PII") as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

57. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[17]

58. For example, PII can be sold at a price ranging from $40 to $200.[18] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

---

[15] 17 C.F.R. § 248.201 (2013).
[16] *Id.*
[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[18] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[19] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

59. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

60. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

61. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach

is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

62. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

63. Defendant knew or should have known of the risks and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

***Defendant Failed to Comply with FTC Guidelines***

64. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

65. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their

network's vulnerabilities; and implement policies to correct any security problems.[20] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[21]

66. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

67. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect client data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting

[20] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited November 21, 2025).

[21] *Id*.

from these actions also clarify the measures businesses must take to meet their data security obligations.

68. Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' and customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

69. Defendant was always fully aware of its obligation to protect the PII of its employees and customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Failed to Comply with Industry Standards***

70. As shown above, large employers are widely known to be particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

71. Several best practices have been identified that at a minimum should be implemented by employers like Defendant, including, but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, antivirus, and antimalware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

72. Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

73. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

74. These foregoing frameworks are existing and applicable industry standards for any business that handles and stores large volumes of sensitive information, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

## V. <u>DEFENDANT'S BREACH</u>

75. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain

and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect employees' and customers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to train employees in the proper handling of emails containing how the cyberattackers were able to first access Defendant's networks, and to and maintain adequate email security practices;

e. Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

f. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

g. Failing to adhere to industry standards for cybersecurity.

76. As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

77. Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft.

***Because of Defendant's Failure to Safeguard Private Information, Plaintiff and the Class Members Have and Will Experience Substantial Harm.***

78. Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

79. The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

80. Because of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their PII is used;

b. The diminution in value of their PII;

c. The compromise and continuing publication of their PII;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen PII; and

h. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

81. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

82. The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various Dark Web internet websites, making the information publicly available, for a substantial fee of course.

83. It can take victims years to spot identity or PII theft, giving criminals plenty of time to milk that information for cash.

84. One such example of criminals using PII for profit is the development of "Fullz" packages.

85. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on

individuals. These dossiers are known as “Fullz” packages.

86. The development of “Fullz” packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff’s and the proposed Class’s phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff’s and other members of the proposed Class’s stolen PII is being misused, and that such misuse is traceable to the Data Breach.

87. According to the FBI’s Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

88. Further, according to the same report, “rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good” Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

89. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

90. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

91. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

92. The Federal Trade Commission ("FTC'') has also recognized that consumer data is a new and valuable form of currency.

93. The FTC has also issued Many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

(1) encrypting information stored on computer networks;

(2) retaining payment card information only as long as necessary;

(3) properly disposing of personal information that is no longer needed;

(4) limiting administrative access to business systems;

(5) using industry-tested and accepted methods for securing data;

(6) monitoring activity on networks to uncover unapproved activity;

(7) verifying that privacy and security features function properly;

(8) testing for common vulnerabilities; and

(9) updating and patching third-party software.

94. According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[22] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

95. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an

[22] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual- library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited November 7, 2024).

extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[23]

96. Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

97. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [24] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[25]

98. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name.

---

[23] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited April 30, 2025).

[24] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[25] *Id.*

> Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

99. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[27] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[28]

100. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

101. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply

---

[26] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[27] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[28] *See* https://www.investopedia.com/terms/s/ssn.asp

for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

102. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

103. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

104. The California state government warns patients that: "[o]riginally, your

---

[29] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[30]

105. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: "For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated."

106. What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII are valuable property rights.

107. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

---

[30] *See* https://oag.ca.gov/idtheft/facts/your-ssn

108. Where the most PII belonging to Plaintiff and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

109. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO Report, at p. 29.

110. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

111. The Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

112. To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the

Data Breach. Defendant has only offered 12 months of inadequate credit monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

113. Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and should have strengthened its data systems accordingly.

114. Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

115. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

116. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

117. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is

expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

118. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

119. By spending this time, Data Breach Plaintiff and Class Members were not manufacturing their own harm; rather, Plaintiff and Class Members were taking necessary steps at Defendant's direction because the Data Breach included their Social Security number.

120. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have experienced and will experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

121. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in

which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[31]

***Diminution in Value of Private Information***

122. PII is a valuable property rights.[32] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

123. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[33]

124. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[34]

[31] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[32] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[33] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[34] https://datacoup.com/

125. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[35]

126. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

127. Based on the value of the information stolen, the data either has been sold or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, this data is ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

[35] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

128. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

129. Given the risks to Plaintiff and the Class Members, the future cost of credit and identity theft monitoring is both reasonable and necessary.

130. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Plaintiff and the Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

## VI. PLAINTIFF'S EXPERIENCE

131. Plaintiff Aiyanna Johnson is and at all times mentioned herein was an individual citizen of Michigan, residing in the city of Muskegon.

132. Plaintiff was an employee at Epi Breads, requiring her to provide her Private Information to Defendant.

133. Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard her Private Information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to the same. Plaintiff would

not have provided her Private Information to Defendant had she known that Defendant would not take reasonable steps to safeguard it.

134. Plaintiff is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff also stores any documents containing her sensitive information in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for online accounts containing sensitive information.

135. After Plaintiff provided her Private Information to Defendant, Defendant suffered a Data Breach.

136. Because of the Data Breach, Plaintiff's Private Information is now in the hands of cybercriminals.

137. Plaintiff suffered actual injury in the instant her Private Information was accessed and obtained by a third party without her consent or authorization.

138. At the moment Plaintiff's Private Information was accessed, she suffered injury from a loss of privacy.

139. Defendant notified Plaintiff of the Data Breach by mail on or around October 30, 2024, over two months after Defendant became aware of the Data Breach. *See* Exhibit A.

140. As a result of the Data Breach, Plaintiff's Private Information has already been stolen and published by criminals on the dark web.

141. Because of the Data Breach and at the direct recommendation of Defendant and its Notice, Plaintiff made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, pulling her credit reports, researching the Data Breach and reviewing financial statements.

142. Plaintiff has spent much time responding to the dangers from the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including, but not limited to work and recreation.

143. Plaintiff is especially alarmed by the type of information listed, because it is well known that Social Security numbers can be used for a variety of forms of fraud and identity theft. Moreover, Plaintiff cannot be sure whether more of her PII was stolen.

144. Plaintiff knows that cybercriminals often sell Private Information, and that her PII could be abused months or even years after a data breach.

145. Plaintiff has suffered actual injury in the form of having her PII stolen in the Data Breach.

146. Shortly after the Data Breach, Plaintiff noticed a serious increase in spam calls and texts following the Data Breach which she believes are caused by the Data Breach. This misuse of her Private Information was caused, upon

information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate Private Information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing additional sensitive private information for use in committing identity theft or fraud. Plaintiff attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity.

147. In addition, since the Data Breach, Plaintiff's Social Security has been used without authorization to make fraudulent inquiries into Plaintiff's credit and to fraudulently apply for credit cards in Plaintiff's name. Plaintiff received open credit cards in the mail for which she never applied and had to go through the time and expense of closing those accounts. Also, since the Data Breach, Plaintiff has had new phone(s) and phone lines opened in her name without her knowledge or consent. She has suffered monetary damage, as well as lost time, as a result of dealing with these fraudulent activities.

148. The above activities have caused damage to Plaintiff's credit, which impacts Plaintiff's ability to obtain loans, take out her own credit cards and engage in other activities that require credit. Plaintiff has spent time and effort to ameliorate

the effects, but the risk of the issue continuing in the future is apparent. Plaintiff traces these fraudulent transactions to Defendant's Data Breach, as they started shortly thereafter and she had not previously experienced any fraudulent credit-line openings.

149. Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted Defendant with her personal data.

150. Moreover, as a result of the Data Breach, Plaintiff has experienced stress, anxiety, and concern due to the loss of her privacy and concern over the impact of cybercriminals accessing and misusing her Private Information that has already occurred and will continue to occur in the future.

151. Plaintiff anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

152. Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the injury flowing from fraud and identity theft posed by Plaintiff's Private Information being placed in the hands of cybercriminals; (c) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff's Private Information being placed in the hands of cybercriminals; (d) damages to and/or diminution in value of Plaintiff's Private Information that was entrusted to Defendant; and (e) continued risk to Plaintiff's Private Information, which remains

in the possession of Defendant and which is subject to further breaches so long as it fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to it.

## VII. PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

153. To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 12 months of inadequate credit monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

154. The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

155. Defendant's credit monitoring advice to Plaintiff and Class Members places the burden on Plaintiff and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

156. Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

157. Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

158. Plaintiff was damaged in that her Private Information is in the hands of cybercriminals.

159. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

160. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

161. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

162. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private

Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

163. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

164. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

165. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

166. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing “freezes” and “alerts” with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare

providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and; and

f. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

167. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

168. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and concern due to the loss of their privacy and concern over the impact of cybercriminals accessing and further misusing their Private Information.

## VIII. CLASS ACTION ALLEGATIONS

169. This action is brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

170. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated.

171. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All persons whose Private Information was compromised in the Data Breach, including all persons who were sent notice of the Data Breach (the "Class").**

172. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

173. Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

174. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them in a single proceeding is impracticable. The exact number of Class Members is unknown to Plaintiff now, but Defendant has reported to the Maine Attorney General that 10,853 persons were affected by the Data Breach.

175. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i. Whether Defendant failed to provide notice of the Data Breach promptly; and

j. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

176. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class

Members arise from the same operative facts and are based on the same legal theories.

177. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

178. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

179. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

180. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

181. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

182. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## IX. CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiff and All Class Members)

183. Plaintiff re-alleges and incorporates paragraphs 1-182 as if fully set forth herein.

184. Defendant required Plaintiff and Class Members to submit non-public personal information to be employed or otherwise do business with Epi Breads.

185. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

186. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

187. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining employment or services from Defendant.

188. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

189. Defendant further had a duty to use reasonable care in protecting confidential data because Defendant is bound by industry standards to protect confidential Private Information.

190. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised;

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

191. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class

Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

192. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

193. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

194. Defendant's negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

195. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and All Class Members)**

196. Plaintiff re-alleges and incorporates paragraphs 1-182 as if fully set forth herein.

197. Under the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

198. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class Members.

199. Plaintiff and Class Members ar within the class of persons that the FTC Act is intended to protect.

200. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act is intended to guard against.

201. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

202. The FTC has pursued enforcement actions against businesses, which, as a result of their failures to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

203. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of this statute and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

204. Defendant breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

205. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

206. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

207. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that by failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

208. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## THIRD COUNT
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and All Class Members)

209. Plaintiff re-alleges and incorporates paragraphs 1-182 as if fully set forth herein.

210. Plaintiff and Class Members entrusted their Private Information to Defendant. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for employment or Defendant's services, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

211. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

212. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and adhered to industry standards.

213. Plaintiff and Class Members paid money to Defendant or provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

214. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

215. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

216. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

217. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

218. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

219. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

220. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members

**FOURTH COUNT**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

221. Plaintiff re-alleges and incorporates paragraphs 1-182 as if fully set forth herein.

222. Plaintiff and Class Members bring this Count in the alternative to their breach of implied contract claim.

223. Plaintiff and Class Members conferred a direct monetary benefit on Defendant by virtue of Defendant collecting, using and sharing Plaintiff's and Class Members' PII, a portion of which was reasonably paid for the storage and maintenance of Plaintiff's and Class Members' Private Information in Defendant's systems.

224. Plaintiff and Class Members have an interest, both equitable and legal, in their PII that was collected and maintained by Defendant and that was ultimately compromised in the Data Breach.

225. Defendant, by way of its acts and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on security measures to secure Plaintiff and Class Members' PII. Defendant also understood and appreciated the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

226. Instead of providing for a reasonable level of security that would have prevented the Data Breach—as is common practice among companies entrusted with such PII—Defendant instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiff and Class Members.

227. Nevertheless, Defendant continued to obtain the benefits conferred on it by Plaintiff and Class Members. The benefits conferred upon, received, and enjoyed by Defendant were not conferred gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

228. The relationship between Defendant and Plaintiff and Class Members is not attenuated, as Plaintiff and Class Mmbers had a reasonable expectation that the security of their PII would be maintained when they provided their Private Information to Defendant.

229. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result. As a result of Defendant's decision to profit rather than provide

requisite security, and the resulting Data Breach disclosing Plaintiff and Class Members' PII, Plaintiff and Class Members suffered and continue to suffer considerable injuries in the forms of, inter alia, attempted identity theft, time and expenses mitigating harms, diminished value of PII, loss of privacy, increased risk of harm, and stress and anxiety.

230. Thus, Defendant engaged in opportunistic conduct in spite of its duties to Plaintiff and Class Members, wherein it profited from interference with Plaintiff and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its conduct.

231. Accordingly, Plaintiff and Class Members are entitled to relief in the form of restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically, the profits obtained by Defendant from the use of Plaintiff's and Class Members' PII and the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiff and Class Members' PII, and compensatory damages.

## FIFTH COUNT
## DECLARATORY JUDGMENT
## (On behalf of Plaintiff and the Class)

232. Plaintiff re-alleges and incorporates paragraphs 1-182 as if fully set forth herein.

233. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal statutes described in this Complaint.

234. Defendant owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' PII.

235. Defendant still possesses the PII of Plaintiff and Class Members. Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and the risk remains that further compromises of their PII will occur in the future.

236. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, inter alia, the following:

a. Defendant owes a legal duty to secure Plaintiff and Class Members' PII and to timely notify the public of a data breach under the common law and Section 5 of the FTC Act;

b. Defendant's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect Plaintiff and Class Members' PII; and

c. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff and Class Members' PII.

237. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with legal and industry standards to protect PII, including the following:

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendant's duties and obligations, Defendant must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

v. conducting regular database scanning and security checks; and

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

238. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach. The risk of another such breach is real, immediate, and substantial.

239. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

240. Issuance of the requested injunction will serve the public interest by preventing a subsequent data breach, thus preventing future injury to Plaintiff and Class Members whose PII would be further compromised.

**SIXTH COUNT**
**VIOLATIONS OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**Ga. Code Ann. § 10-1-370, *et seq.***
**(On behalf of Plaintiff and the Class)**

241. Plaintiff realleges the allegations in paragraphs 1-182 by as if fully set forth herein.

242. Defendant, Plaintiff, and Class Members are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("GUDPTA"), Ga. Code Ann. § 10-1-371(5).

243. Defendant engaged in unfair and deceptive acts and practices in violation of the GUDTPA, Ga. Code Ann. § 10-1-372, which states in pertinent part that it is a deceptive trade practice to:

(a)(5) Represent[] that goods or services have sponsorship, approval, characteristics,…uses, [or] benefits…that they do not have;

(a)(7) Represent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another; or

(a)(12) Engage[] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

244. Defendant engaged in deceptive trade practices in violation of the GUDTPA, Ga. Code Ann. § 10-1-372(a)(5), (7), and (12) by among other things:

- Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Class Members' PII, which was a direct and proximate cause of the Data Breach;

- Making implied or implicit representations that its data security practices were sufficient to protect Plaintiff and Class Members' PII. Defendant made implied or implicit representations that its data security practices were sufficient to protect Plaintiff and Class Members' PII. By virtue of collecting, storing and sharing Plaintiff's and Class Members' PII, Defendant implicitly represented that its data security processes were sufficient to safeguard the PII;

- Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

- Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, , which was a direct and proximate cause of the Data Breach;

- Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' PII, including by implementing and maintaining reasonable security measures;

- Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

- Failing to timely and adequately notify Plaintiff and Class Members of the Data Breach;

- Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

- Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties

imposed by the FTC Act, 15 U.S.C. § 45.

245. Past data breaches put Defendant on notice that its data security practices were inadequate to safeguard Plaintiff's and Class Members' PII, and Defendant knew or should have known that the risk of a data breach was highly likely.

246. Defendant knew that its data security practices were inadequate to safeguard Plaintiff's and Class Members' PII, and Defendant knew or should have known that the risk of a data breach was high.

247. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

248. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on its misrepresentations and omissions.

249. Plaintiff and Class Members had no opportunity to make any inspection of Defendant's data security practices or to otherwise ascertain the truthfulness of Defendant's representations and omissions regarding data security, including Defendant's failure to alert Plaintiffs and Class Members that their data security and data storage systems were not adequately secure and, thus, were vulnerable to attack.

250. Plaintiff and Class Members reasonably expected that Defendant's data security and data storage systems were adequately secure to protect their PII.

251. Plaintiff and Class Members reasonably relied on Defendant to advise them if their data security and data storage systems were not adequately secure to protect their PII.

252. Plaintiff and Class Members reasonably relied on Defendant's misrepresentations and deceptive omissions regarding their data security practices.

253. Had Defendant disclosed that its data security and data storage systems were not secure, and thus, vulnerable to attack, Plaintiff and Class Members would not have entrusted Defendant with their PII.

254. Had Defendant disclosed to Plaintiff and Class Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business, and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant collected and maintained sensitive and valuable PII while keeping the inadequate state of its security controls secret from the public. Plaintiffs and Class Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

255. Defendant acted intentionally, knowingly, and maliciously to fail to properly secure Plaintiff's and Class Members' PII and recklessly disregarded Plaintiff's and Class Members' rights. Defendant knew that its security and privacy protections were inadequate.

256. As a direct and proximate result of Defendant's unfair and deceptive business practices, Plaintiff and Class Members suffered ascertainable losses, including but not limited to, a loss of privacy, the loss of the benefit of their bargain, out-of-pocket monetary losses and expenses, the value of their time reasonable incurred to remedy or mitigate the effects of the Data Breach, the loss of value of their PII, the imminent and substantially increased risk of fraud and identity theft, and the need to dedicate future expenses and time to protect themselves against further loss.

257. To date, Defendant has not provided sufficient details regarding the full scope of the Data Breach, or any details related to the remedial measures it has taken to improve its data security practices and more fully safeguard Plaintiff's and Class Members' PII from future compromise. As a result, Plaintiff and Class Members remain uninformed and confused as to the adequacy of Defendant's data security and Defendant's ability to protect the PII entrusted to it. Without adequate improvements, Plaintiff's and Class Members' PII remains at an unreasonable risk of future compromise.

258. Defendant, through its misrepresentations, omissions, and Data Breach Notice Letters, continues to represent and imply that its data security measures are adequate to protect consumers' PII. Such continued representations and implications, without disclosure of the full scope of the Data Breach or Defendant's

subsequent remedial enhancements, place Plaintiff and Class Members at a future risk of harm, as Plaintiff and Class Members are not fully informed as to whether Defendant's data security measures have been improved since the Data Breach. By all available measures, Defendant's data security practices and systems have not been adequately improved, and Plaintiff and Class Members remain at an unreasonable risk from future cyberattacks.

259. Plaintiff and Class Members are therefore entitled to the injunctive relief sought herein, because, among other things, Defendant continues to retain their PII, future cyber-attacks targeting the same data are foreseeable, and Defendant has not provided sufficient notice identifying any remedial measures that will protect the data from future attack. Moreover, absent injunctive relief, Defendant will continue to misrepresent and imply that its data security practices and systems are adequate to protect the PII of Plaintiffs and Class Members from future cyberattacks without providing any firm details or basis to support these representations.

260. The GUDTPA states that the "court, in its discretion, may award attorney's fees to the prevailing party if . . . [t]he party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive." Ga. Code Ann. § 10-1-373(b)(2). Defendant willfully engaged in deceptive trade practices knowing them to be deceptive. Defendant knew or should have knows that its data security practices were deficient. Defendant was aware that entities

responsible for collecting and maintaining large amounts of Private Information, including Social Security numbers, are frequent targets of sophisticated cyberattacks. Defendant knew or should have known that its data security practices were insufficient to guard against those attacks.

261. The GUDTPA states that "[c]osts shall be allowed to the prevailing party unless the court otherwise directs." Ga. Code Ann. § 10-1-373(b). Plaintiffs and the Class are entitled to recover their costs of pursuing this litigation.

262. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by the GUDTPA, including injunctive relief, and attorneys' fees and costs.

## SEVENTH COUNT
## VIOLATION OF O.C.G.A. § 13-6-11
## (On behalf of Plaintiff and the Class)

263. Plaintiff re-alleges and incorporates paragraphs 1-182 as if fully set forth herein.

264. As alleged herein, Defendant acted in bad faith, was stubbornly litigious, or caused Plaintiff and Class Members unnecessary trouble and expense with respect to the events underlying this litigation.

265. As alleged herein, Defendant harmed Plaintiff and Class Members by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and

amount of PII that it obtained and stored and the foreseeable consequences of a data breach.

266. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to implement and use reasonable measures to protect Plaintiff's and Class Members' PII. Various FTC publications and orders also form the basis of Defendant's duty.

267. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with industry standards.

268. Defendant's conduct was particularly unreasonable given the nature and amount of PII that it obtained and stored and the foreseeable consequences of a data breach.

269. Defendant also has a duty under the Georgia Constitution which contains a Right to Privacy clause, Chapter 1, Article 1, to protect its users' PII. The Constitution states "no person shall be deprived of life, liberty, or property except by due process of law." Moreover, the Constitution identifies certain invasions of privacy, including the Public Disclosure of Private Life which prohibits the public disclosure of private facts.

270. This duty has been recognized by the Georgia Supreme Court in the

Restatement of the Law of Torts (Second) § 652A which specifically recognized four common law invasion of privacy claims in Georgia, which include (1) appropriation of likeness; (2) intrusion on solitude or seclusion; (3) public disclosure of private facts; and (4) false light.

271. Defendant's affirmative implementation of inadequate data security measures, its failure to resolve vulnerabilities and deficiencies, and its abdication of its responsibility to reasonably protect the PII of Plaintiff and Class Members that it stored on its own servers and databases constitutes a violation of the Constitution and the Restatement of the Law of Torts (Second).

272. Defendant knew or should have known that it had a responsibility to protect the PII it stored, that it was entrusted with this PII, and that it was the only entity capable of adequately protecting the PII on its systems and databases.

273. Despite that knowledge, Defendant abdicated its duty to protect the PII that Defendant stored.

274. As a direct and proximate result of Defendant's actions, Plaintiff and Class Members' PII was accessed and stolen by cybercriminals. The Data Breach was a direct consequence of Defendant's abrogation of its data security responsibilities and its decision to employ knowingly deficient data security measures that knowingly left the PII unsecured. Had Defendant adopted reasonable data security measures, it could have prevented the Data Breach.

275. As further described above, Plaintiff and Class Members have been injured and suffered losses directly attributable to the Data Breach.

276. Plaintiff and Class Members therefore request their claim for recovery of expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a Judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above seeks the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and her counsel to represent the Class, and finding that Plaintiff is a proper representative of the Class requested herein;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety,

and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e. For an Order directing Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees pursuant to O.C.G.A. § 13-6-11 and as otherwise allowable by law;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 25, 2025

Respectfully submitted,

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson

GA Bar No. 725843
**Gibson Consumer Law Group, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA 30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

Leigh S. Montgomery* (*pro hac vice forthcoming*)
Texas Bar No. 24052214
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Ste. 200
Houston, Texas 77066
Telephone: (713) 554-2377
Facsimile: (888) 276-3455
lmontgomery@eksm.com

**COUNSEL FOR PLAINTIFF AND PUTATIVE CLASS ACTION MEMBERS**

## CERTIFICATE OF COMPLAINCE

Pursuant to Local Rule 5.1(B) of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing has been prepared in Times New Roman, 14-point font, as permitted by Local Rule 5.1.

This 25th day of November, 2025.

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson
GA Bar No. 725843